**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER FURLAN and** | : | **CIVIL ACTION** |
| **VALERIE FURLAN, parents and natural** | : | |
| **guardians of ROBERT T. FURLAN, a minor,** | : | |
| **Plaintiffs,** | : | **NO. 10-6870** |
| **vs.** | : | |
| | : | |
| **SCHINDLER ELEVATOR CORPORATION,** | : | |
| **Defendant.** | : | |

**DuBOIS, J.**                                                      **March 29, 2012**

**M E M O R A N D U M**

## I.   INTRODUCTION

In this action, plaintiffs Christopher and Valerie Furlan allege that defendant Schindler

Elevator Corporation's ("Schindler's") negligent maintenance of a department-store escalator

caused an injury to their minor son.[1]  Presently before the Court are two motions: the Daubert

Motion of Schindler Elevator Corporation to Preclude the Testimony of Richard A. Kennedy and

the Motion of Defendant Schindler Elevator Corporation for Summary Judgment.  For the

reasons that follow, the Court grants both motions.

## II.   BACKGROUND

A.    The May 29, 2006, Incident

On May 29, 2006, Christopher and Valerie Furlan took their two children to the Granite

Run Mall in Media, Pennsylvania.  (Statement Facts Schindler Contends Undisputed ("Def.'s

---

[1]Plaintiffs have withdrawn their claims for strict product liability and breach of warranty.
(See Pls.' Resp. Def.'s Mot. Summ. J. ("Pls.' Resp. Summ. J.") 2.)  The negligent-maintenance
claim is thus all that remains in the case.

Stmt. Facts") ¶ 2.)[2]  The family was shopping on the lower level of the Boscov's department store when three-year-old Robert's hand became caught in the inlet of the "down" escalator.  (Id. ¶ 3.)  The inlet is the space where the escalator's moving handrail enters the escalator's balustrade,[3] and it is surrounded by a plastic finger guard.  (See Report of Jon B. Halpern, Defs.' Mot. Summ. J. Ex. H ("Halpern Report"), at 2.)

Neither parent saw Robert's hand enter the inlet.  (Christopher Furlan Dep., Pls.' Resp. Summ. J. Ex. A ("Christopher Furlan Dep."), at 29-31; Valerie Furlan Dep., Pls.' Resp. Summ. J. Ex. H ("Valerie Furlan Dep."), at 26.)  However, Mr. and Mrs. Furlan rushed to Robert when they heard him scream.  (Christopher Furlan Dep. 30-31; Valerie Furlan Dep. 26.)  They observed that Robert's left hand was stuck in the inlet "up to where the fingers stop."  (Valerie Furlan Dep. 27; see also Christopher Furlan Dep. 38-39.)  Mr. Furlan stopped the escalator by pressing the emergency stop button.  (Christopher Furlan Dep. 31.)  When he pulled Robert's hand out of the inlet, Mr. Furlan observed "a lot of denuded flesh."  (Id. at 41.)  The family immediately took Robert to Riddle Memorial Hospital, where medical personnel cleaned and dressed the wound.  (Id. at 44, 46.)  In the ensuing months, Robert underwent physical therapy and his parents provided care at home.  (Valerie Furlan Dep. 33-35.)

On July 11, 2007, Robert began treatment with Dr. Benjamin Chang, a pediatric hand surgeon at the Children's Hospital of Philadelphia.  (Report of Dr. Benjamin Chang, Pls.' Resp. Summ. J. Ex. B, at 1, 3.)  At that time, Robert was experiencing "pain in [his] scar" and was

---

[2]The Scheduling Order of October 21, 2011, directed plaintiffs to specifically identify any facts in defendant's statement of undisputed facts which plaintiffs disputed.  Plaintiffs did not do so.  Accordingly, the Court treats as undisputed those facts listed in the Statement of Material Facts Which Schindler Contends Are Undisputed which are referenced in this Memorandum.

[3]The balustrade is the escalator's side wall.

unable to extend some of his fingers fully.  (Id.)  Dr. Chang performed surgery on September 14,

2007, excising the scars on Robert's fingers and performing a skin graft.  (Id. at 2.)  At a follow-

up visit on August 27, 2008, Dr. Chang observed that Robert "had full flexion and extension of

all digits," the skin grafts were fully healed, and a "neurovascular exam was normal in the injured

digits."  (Id. at 2.)  As of October 27, 2009, Dr. Chang opined that Robert's prognosis was good

and additional surgery would not be required.  (Id. at 3.)

     B.     <u>Defendant's Alleged Role in the Incident</u>

     Defendant's involvement in this lawsuit arises from a contract ("the Preventive

Maintenance Agreement") under which defendant agreed to maintain the escalator at issue.  In

2000, Boscov's hired defendant to perform preventive maintenance on the escalator, along with

other escalators and elevators at Boscov's stores in the Northeast.  (Preventive Maintenance

Agreement, Pls.' Resp. Summ. J. Ex. D, at 1-3.)  Haughton Elevator Company manufactured the

escalator but is not a party to this lawsuit.  (Def.'s Stmt. Facts ¶ 8.)  The escalator, which is an

HC-48 model, was installed in 1974.  (Id.)

     Under the Preventive Maintenance Agreement, defendant agreed to "[r]egularly and

systematically examine, clean, lubricate[,] adjust[,] and when conditions warrant, repair or

replace" particular components of the escalator and to "[t]est all operating and safety devices as

required by" the American National Standards Institute ("ANSI") A.17.1 Safety Code for

Elevators and Escalators.  (Preventive Maintenance Agreement 6.)  The Preventive Maintenance

Agreement provided that defendant would make "only those replacements, adjustments[,] and

repairs" made necessary by "ordinary wear and tear."  (Id. at 8.)  Defendant was not obligated to

"make changes or modifications in design or make any replacements with parts of a different

design."  (Id.)  In addition, defendant expressly "assume[d] no responsibility" for several parts of the escalator, including the balustrade.  (Id. at 6.)

       C.     The Present Action

Plaintiffs filed their Complaint in the Court of Common Pleas of Delaware County on October 5, 2010.  Defendant removed the case to this Court on November 23, 2010, and filed the motions presently at issue on December 2, 2011.

## III.  DEFENDANT'S DAUBERT MOTION

The Court begins by addressing defendant's motion to exclude the testimony of Richard A. Kennedy, whom plaintiff offers as an expert in escalator safety and maintenance.  For the reasons explained below, the Court grants the motion.

       A.     Legal Standard

Federal Rule of Evidence ("Rule") 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The "pathmarking" Supreme Court cases interpreting Rule 702 are Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire v. Carmichael, 526 U.S. 137 (1999).  United States v. Mitchell, 365 F.3d 215, 234 (3d Cir. 2004).  In Daubert, the Supreme Court held that "[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592.  In Kumho

Tire, the Supreme Court made clear that the Daubert gatekeeping function extends beyond

scientific testimony to testimony based on "technical" and "other specialized" knowledge.  526

U.S. at 141.

Under Daubert, courts must address a "trilogy of restrictions" before admitting expert

testimony: qualification, reliability, and fit.  Schneider ex rel. Estate of Schneider v. Fried, 320

F.3d 396, 404 (3d Cir. 2003); see also Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).

The party offering the expert must prove each of these requirements by a preponderance of the

evidence.  In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

      1.      Qualification

With respect to qualification, "Rule 702 requires the witness to have 'specialized

knowledge' regarding the area of testimony."  Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300

F.3d 325, 335 (3d Cir. 2002) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  The

Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to

insist on a certain kind of degree or background when evaluating the qualifications of an expert.

See Waldorf, 142 F.3d at 625.  "The language of Rule 702 and the accompanying advisory

committee notes make clear that various kinds of 'knowledge, skill, experience, training, or

education,' qualify an expert as such."  In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 855 (3d

Cir. 1990) ("Paoli I") (quoting Fed. R. Evid. 702).

Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the

formal qualifications of experts."  Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not

deem the proposed expert to be the best qualified or because the proposed expert does not have

the specialization that the court considers most appropriate." Id. (quoting Holbrook v. Lykes

Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

        2.     Reliability

The reliability requirement of Daubert "means that the expert's opinion must be based on

the 'methods and procedures of science' rather than on 'subjective belief or unsupported

speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard

PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) ("Paoli II") (quoting Daubert, 509 U.S. at 590).  The

Supreme Court held in Kumho Tire that the Daubert test of reliability is "flexible" and "the law

grants a district court the same broad latitude when it decides how to determine reliability as it

enjoys in respect to its ultimate reliability determination."  526 U.S. at 141-42 (emphasis

omitted).  In determining whether the reliability requirement is met, courts examine the following

factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether
> the method has been subject to peer review; (3) the known or
> potential rate of error; (4) the existence and maintenance of standards
> controlling the technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the technique to methods
> which have been established to be reliable; (7) the qualifications of
> the expert witness testifying based on the methodology; and (8) the
> non-judicial uses to which the method has been put.

Mitchell, 365 F.3d at 235 (citing Paoli II, 35 F.3d at 742 n.8).  These factors are neither

exhaustive nor applicable in every case.  Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-

07 (3d Cir. 1997).

Under the Daubert reliability prong, parties "do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are correct, they only have to

demonstrate by a preponderance of evidence that their opinions are reliable." Paoli II, 35 F.3d at

744 (emphasis omitted).  "The evidentiary requirement of reliability is lower than the merits

standard of correctness." Id.  "As long as an expert's scientific testimony rests upon 'good

grounds, based upon what is known,' it should be tested by the adversary process—competing

expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for

fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Mitchell,

365 F.3d at 244 (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st

Cir. 1998)).

### 3.     Fit

For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact

to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  "This condition

goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is

not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citations and internal quotation

marks omitted).  "'Fit' is not always obvious, and scientific validity for one purpose is not

necessarily scientific validity for other, unrelated purposes." Id.

### B.     Analysis

The opinion Mr. Kennedy has proffered in this case does not satisfy Daubert's reliability

requirement.  The Court thus grants defendant's motion to exclude his testimony.

### 1.     Mr. Kennedy's Background

Mr. Kennedy holds a Bachelor of Arts degree in Sociology from Villanova University and

a Master of Business Administration degree from Widener University.  (Kennedy Curriculum

Vitae, Pls.' Resp. Daubert Mot. Ex. A ("Kennedy C.V.") 1.)  He is President and CEO of Kencor Inc., Elevator Systems ("Kencor"), which is a "full service elevator company."  (Id.)  Since the late 1980s or early 1990s, Kencor has "made a business decision" not to do any work involving escalators, (Kennedy Dep.,  Pls.' Resp. Daubert Mot. Ex. B ("Kennedy Dep.") 36-37), but Mr. Kennedy performed some escalator-maintenance work in the 1980s, (id. at 38-39).  He is certified as a Qualified Elevator Inspector, which allows him to conduct safety inspections of escalators and elevators.  (Kennedy C.V. 1.)  He has never actually performed a safety inspection of an escalator, although plaintiffs emphasize that he has "done countless forensic inspections of elevators and escalators."[4]  (Pls.' Resp. Daubert Mot. 10 (emphasis added).)

> 2.   Mr. Kennedy's Opinion

The first part of Mr. Kennedy's expert report presents his interpretation of the Preventive Maintenance Agreement.  Mr. Kennedy opines that the contract required defendant to maintain the finger guard because, inter alia, it required defendant to "test all operating and safety devices as required by" the ANSI Code, (Kennedy Report 4-5), and the finger guard is not part of the balustrade, which was excluded from the contract, (Kennedy Dep. 104-06).

Further, Mr. Kennedy contends that because Robert's fingers were able to fit in the inlet, defendant must have negligently failed to repair or replace the finger guard.  He relies on Section 802.4c of the 1971 edition of the ANSI A.17.1 Code.[5]  That section provides, "Hand or finger

---

[4]Plaintiffs do not disaggregate how many of those forensic inspections involved escalators, as opposed to elevators.

[5]The parties agree that the 1971 edition of the ANSI Code applies because it was in force when the escalator at issue was installed, and new editions of the ANSI Code are not retroactive to previously installed equipment.

guards shall be provided at the point where the handrail enters the balustrade." The Handbook that accompanies the 1987 edition of the Code elaborates, "Hand or finger guards provide protection for the curious, especially children, who want to explore the area where the handrail enters the balustrade."

Based on those provisions and the fact that Robert's fingers fit into the inlet, Mr. Kennedy concludes that the finger guard must have been worn. (See, e.g., Kennedy Dep. 86 (referring, when asked for evidence of wear, only to the fact that "the handrail guard did not prevent a child's hand from going in").) According to Mr. Kennedy, photographs Mr. Furlan took shortly after the incident reinforce this conclusion. (Id. at 91.) Mr. Kennedy testified that the finger guard "look[ed] like it [was] worn" in the photographs because there was "a space where a small child's hand could get in there." (Id. at 66-67.)

Mr. Kennedy acknowledges that for an escalator to operate properly, there must be some space between the handrail and the finger guard. (See, e.g., Kennedy Dep. 72-73.) However, he does not know whether an escalator with the requisite clearance could completely prevent children's fingers from entering the inlet:

> Q: Can you tell me if there is a minimum clearance that would
> prevent a child's finger from being trapped at the point where
> there's a fixed finger guard and a moving handrail?
> A: No.
> Q: Is that because you're not qualified to express that opinion?
> A: Yes.  I'm not a biomechanical engineer.

(Id. at 130-31.) He also does not know whether the finger guard at issue differed in any way from a finger guard on a newly installed HC-48 escalator. (Kennedy Dep. 71.) He has never seen a finger guard for an HC-48 escalator in new condition, (id. at 70-71), and he does not know

what the design specifications for such a component are, (id. at 74-75).

Defendant attacks Mr. Kennedy's qualifications, as well as the reliability and fit of his testimony. Plaintiffs respond that the qualification standard is "liberal"; that Mr. Kennedy reached an "educated and well-reasoned opinion" based on his experience, a site inspection, and a thorough review of the litigation documents; and that his testimony will assist the trier of fact.

3.      Reliability Analysis

Mr. Kennedy's opinion does not satisfy Daubert's reliability requirement. "If Daubert and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the ipse dixit of the expert." Pappas v. Sony Elecs., Inc., 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000). In Oddi v. Ford Motor Co., for example, the Third Circuit considered an engineer's opinion that a bread truck was defectively designed. 234 F.3d 136, 146, 156 (3d Cir. 2000). The engineer had engaged in a "haphazard, intuitive inquiry" using "little, if any, methodology beyond his own intuition." Id. at 156, 158. He made no calculations, did not test his hypotheses, and failed to consider alternative explanations for the extensive damage the truck sustained in a collision. Id. at 156-58. The Oddi court cited Paoli II for the principle that, to satisfy the reliability requirement, "[a]n 'expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'" Id. at 158 (quoting Paoli II, 35 F.3d at 742). The court thus precluded the engineer's testimony, holding that his "ipse dixit [did] not withstand Daubert's scrutiny." Id.

Plaintiffs have not demonstrated by a preponderance of the evidence that Mr. Kennedy's opinion is reliable. Like the engineer in Oddi, he "used little, if any, methodology beyond his own intuition." Id. at 158. The only "standard" that guided Mr. Kennedy's analysis was his

10

perception, based on an amateur photograph and the fact that an accident occurred, that the gap between the finger guard and the handrail was too large.  Mr. Kennedy "conducted no tests" to ascertain the adequacy of defendants' maintenance.  Id.  He did not, for example, test whether the Boscov's finger guard was worn by comparing Mr. Furlan's photographs to a brand-new finger guard.  He did not test whether a smaller clearance was feasible; in fact, he asserted that he was "not qualified" to do so.  (Kennedy Dep. 130-31.)  He admitted in his deposition that he has "no idea" by what mechanism Robert's fingers got caught in the escalator.  (Id. at 131-35.)  Other factors similarly show unreliability: plaintiffs presented no evidence that Mr. Kennedy's technique is generally accepted, has been subject to peer review, is an outgrowth of a reliable methodology, or has been put to any nonjudicial use, and his method has no known or potential rate of error.

Finally, Mr. Kennedy's qualifications provide no reassurance that his opinion is reliable.  "[A]n expert's 'level of expertise may affect the reliability of the expert's opinion.'" Elcock, 233 F.3d at 749 (quoting Paoli II, 35 F.3d at 741).[6]  Mr. Kennedy has not performed maintenance work on an escalator since the 1980s.  He has no formal education relating to escalators, engineering, or any relevant field.  At his deposition, he could not identify an instance in which he had maintained or repaired an HC-48 escalator, and he has never seen the finger guard of an HC-48 escalator in new condition.

For these reasons, Mr. Kennedy's opinion does not satisfy Daubert's reliability requirement, and the Court grants defendant's motion to preclude his testimony.

---

[6]Because the Court grants defendant's Daubert motion on reliability grounds, the Court need not determine whether Mr. Kennedy is qualified to present expert testimony in this case.  The Court discusses Mr. Kennedy's qualifications only as a factor in the reliability analysis.

## IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court next addresses defendant's motion for summary judgment.  Because there is no genuine dispute of material fact as to causation, the Court grants the motion.

### A.    Legal Standard

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

### B.    Analysis

Defendant argues that there is no genuine dispute of material fact as to plaintiffs' negligent-maintenance claim.  The Court agrees.  Plaintiffs have not produced evidence from

12

which a reasonable jury could conclude that defendant's conduct or omission caused plaintiffs' injury.

Under Pennsylvania law, "[i]n any case sounding in negligence, a plaintiff must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff."

Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264, 1272-73 (Pa. 2006).

> Generally a party to a contract does not become liable for a breach thereof to one who is not a party thereto.  However, a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons—strangers to the contract—will not be injured thereby . . . . It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract.

Evans v. Otis Elevator Co., 168 A.2d 573, 575 (Pa. 1961).

Defendant argues that plaintiffs have failed to adduce evidence that creates a genuine dispute of material fact as to (1) whether defendant had a duty to maintain the finger guard at issue and (2) whether defendant caused Robert Furlan's injury.  Plaintiffs respond that the Preventive Maintenance Agreement is ambiguous regarding defendant's obligation to maintain the finger guard and that they have produced evidence from which a reasonable jury could find causation.

Pennsylvania law is "clear that the plaintiff has the burden of proving by a fair preponderance of the evidence that defendant was negligent and that his negligence was the proximate cause of the accident."  Flagiello v. Crilly, 187 A.2d 289, 290 (Pa. 1963).  To survive a motion for summary judgment, plaintiffs must "'produce substantial evidence upon which

13

logically the jury's conclusion may be based.'" Denneny v. Siegel, 407 F.2d 433, 440 (3d Cir.

1969) (quoting Smith v. Bell Tel. Co. of Pa., 153 A.2d 477, 480 (Pa. 1959)).  A verdict in

plaintiffs' favor may not be based merely upon "speculation and conjecture."  Id.  "The mere

happening of an accident . . . does not establish negligence nor raise an inference or a

presumption of negligence."  Flagiello, 187 A.2d at 290.

Aside from Mr. Kennedy's excluded opinion, plaintiffs have produced no evidence that

defendant's action or inaction caused Robert's injury.  There is no evidence that the finger guard,

as originally designed, would have prevented the accident.  Plaintiffs have presented evidence

that Robert's fingers fit into the inlet, and they emphasize that a finger guard is "intended to

prevent fingers from entering into the balustrade."  (Surreply Mem. Opp'n Mot. Summ. J. 2.)

However, as stated above, the parties agree that there must be some clearance between a handrail

and a finger guard for an escalator to operate properly.  See supra Section III.B.3.  There is

simply no evidence that the finger guard at issue in this case differed in any way from the

manufacturer's design specifications and resulted in a clearance larger than was necessary to the

functioning of the escalator.[7]

Moreover, the Court rejects plaintiffs' argument that, because the Preventive

Maintenance Agreement required defendant to "[t]est all operating and safety devices as required

---

[7]To the extent that the finger guard may have been defectively designed, defendant would not be responsible for that defect.  The Preventive Maintenance Agreement specifically absolved defendant of an obligation to "make changes in design" or "make any replacements with parts of a different design."  See Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 153-54 (3d Cir. 2001) (holding that a similar contract to "maintain and repair" a building did not require a maintenance company to "fix[] a part of the building that was originally defective").  Based on this provision of the Preventive Maintenance Agreement, the Court also rejects plaintiffs' argument that defendant should have replaced the finger guard with a differently designed guard with an "automatic shut off function."  (Pls.' Resp. Summ. J. 5.)

by A.N.S.I. A-17.1 code," defendant was required to test the finger guard.  A finger guard is not one of the nine "operating and safety devices" identified in section 805 of the Code.  (See Def.'s Reply Mem. Supp. Mot. Summ. J. Ex. O.)  The clear language of the Preventive Maintenance Agreement required defendant to test only those "operating and safety devices" required by the ANSI Code.

On the other hand, defendant has presented several pieces of evidence that the finger guard was in its intended condition at the time of Robert's injury.  First, after examining the photographs Mr. Furlan took shortly after the accident, defendant's expert opined that the finger guard "appears to be the proper guard which is properly mounted and the shape of the guard and the gaps appear to be as designed by the manufacturer and in full compliance with" the ANSI Code.  (Halpern Report 2.)  The expert further stated that, although an as-designed finger guard decreases the risk of entrapment, it cannot "guarantee that an entrapment will not occur."  (Id. at 4.)  Second, on May 2, 2006—twenty-seven days before Robert's accident—a third-party inspector licensed by the state found no deficiencies in the escalator.  (Reinspection Report, Def.'s Mot. Summ. J. Ex. D.)  Moreover, Boscov's employees were required to inspect the finger guard every morning as part of their procedure for opening the store, ensuring that it was "in place and in good condition."  (Daily Escalator Inspection Log, Defs.' Mot. Summ. J. Ex. E, at 1, 2.)

The conduct of defendant's employees shortly before and after Robert was injured also supports a conclusion that the finger guard conformed to its design specifications.  Defendant's technicians inspected the escalator on May 9, 2006, and May 19, 2006.  (Schindler Service Operations Work Reports, Def.'s Mot. Summ. J. Ex. I ("Schindler Work Reports"), at 26-27.)

They found no deficiencies during either visit.  (Id.)  The technician who conducted the May 9 inspection testified that he checks escalators' finger guards as a matter of course, even though he did not know whether the Preventive Maintenance Agreement required him to do so.  (Edward McTaggart III Dep., Pls.' Resp. Summ. J. Ex. F, at 49.)

Moreover, on May 30, 2006—the day after Robert's injury—defendant sent technician Laurence Gagliardi to inspect the escalator.  (Schindler Work Reports 28.)  Mr. Gagliardi spent two hours at Boscov's.  (Id.)  He wrote in his report, "child hand injured bot dn esc rhhr inlet . . . inspect inlet and hr for anything abnormal . . . restart esc."  (Id.)  In other words, the day after Robert's accident, defendant's employee inspected the finger guard and, finding nothing "abnormal," put the escalator back into service.

The overwhelming inference—uncontroverted by plaintiff's evidence—is that, although Robert's injury was unfortunate, it was not caused by negligence on defendant's part.  Plaintiff has produced no evidence that the finger guard, as originally designed, could have prevented Robert's injury.  There is no evidence that the injury was caused by a failure to maintain the finger guard.  The Court thus grants defendant's motion for summary judgment.

## V.    CONCLUSION

For the foregoing reasons, the Court grants the Daubert Motion of Schindler Elevator Corporation to Preclude the Testimony of Richard A. Kennedy.  The Court also grants the Motion of Defendant Schindler Elevator Corporation for Summary Judgment.

An appropriate Order follows.